**Kevin C. Lombardi** (*pending pro hac vice*)
**Charles D. Stodghill** (*pending pro hac vice*)
**SECURITIES AND EXCHANGE COMMISSION**
**100 F Street, NE**
**Washington, DC  20549**
**Telephone:  (202) 551-8753 (Lombardi)**
**Telephone:  (202) 551-4413 (Stodghill)**

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
| | : |
| **Plaintiff,** | :    <u>**COMPLAINT**</u> |
| | : |
| – against – | :    **17-CV-      (      )** |
| | : |
| **WALTER C. LITTLE, and** | : |
| **ANDREW M. BERKE,** | :    **JURY TRIAL DEMANDED** |
| | : |
| **Defendants.** | : |

-----------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission (the "SEC"), alleges as follows:

## SUMMARY

1.      This is an insider trading case.  The scheme involved Walter C. Little ("Little"), a lawyer who over the course of approximately a year repeatedly accessed and obtained material, nonpublic information about 11 upcoming corporate announcements by clients of his former law firm, Foley & Lardner LLP ("Foley").  In breach of his duties of trust and confidence owed to Foley and the firm's clients, Little traded on this material, nonpublic information in advance of announcements relating to mergers and acquisitions, securities offerings, earnings releases, and a trading suspension/exchange de-listing.  In addition to trading himself, Little also tipped Andrew M. Berke ("Berke"), his neighbor, about six of the announcements.  As a result of the scheme set forth in more detail below, the Defendants together reaped illegal profits of over $1 million.

2.      From at least February 2015 through February 2016 ("the Relevant Period"), Little repeatedly accessed documents stored on Foley's internal computer network containing material, nonpublic information about seven Foley clients that were each about to make a significant corporate announcement.  During the Relevant Period, Little did not bill or otherwise perform services for any of the firms' clients whose publicly traded securities are the subject of this action.

3.      After Little accessed documents stored on Foley's network, he contacted Berke on multiple occasions and disclosed material, nonpublic information concerning at least four Foley clients.  Little and Berke each used the material, nonpublic information contained in the Foley documents to trade in the stock and options of Foley's corporate clients.

4.      Little, using his individual brokerage account, traded in advance of at least eleven corporate announcements and realized profits of approximately $363,797.

5.      Berke, using two brokerage accounts that he held jointly with his wife, traded in advance of at least six corporate announcements and realized profits of approximately $640,651.

6.      By knowingly or recklessly engaging in the conduct described in this Complaint, Little and Berke violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [*15 U.S.C. § 77q(a)*] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [*15 U.S.C. § 78j(b)*] and Rule 10b-5 [*17 C.F.R. § 240.10b-5*] thereunder.  By knowingly, recklessly, or negligently engaging in the conduct described in this Complaint, Little and Berke further violated, and unless restrained and enjoined will continue to violate, Section 14(e) of the Exchange Act [*15 U.S.C. § 78n(e)*] and Rule 14e-3 [*17 C.F.R. § 240.14e-3*] thereunder.

## NATURE OF PROCEEDING AND RELIEF SOUGHT

7.      The Commission seeks permanent injunctions against Defendants enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this

Complaint; disgorgement of all profits realized or losses avoided from the unlawful insider trading activity set forth herein; and civil penalties pursuant to Sections 21(d)(3) and 21A of the Exchange Act [*15 U.S.C. §§ 78u(d)(3) and 78u-1*].

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [*15 U.S.C. §§ 77t(b) and 77v(a)*] and Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [*15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa*].

9.      Venue in this district is proper under Section 22(a) of the Securities Act [*15 U.S.C. § 77v(a)*] and Section 27 of the Exchange Act [*15 U.S.C. § 78aa*] because certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of New York.  The shares of each of the issuers that are the subject of this action traded on the New York Stock Exchange ("NYSE") or the NASDAQ Global Market, both of which are located within this district.

10.     Defendants made use of the means, instruments, or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business described in this Complaint.

## DEFENDANTS

11.     **Walter C. Little**, age 43, resides in Apollo Beach, Florida.  Since 2001, he has been licensed to practice law in Florida.  Throughout the Relevant Period, Little was a partner in Foley's Tampa, Florida office and a member of the firm's real estate practice group.  He now practices at another law firm.  Little purchased securities of at least seven issuers that are the subject of this action through an individual brokerage account at Fidelity Investments ("Fidelity").

12.     **Andrew M. Berke,** age 48, resides in Apollo Beach, Florida.  Berke works as an executive/senior manager of a logistics company and is a neighbor of Little.  He purchased the securities of at least four issuers that are the subject of this Complaint through two brokerage accounts held jointly with his wife at Charles Schwab ("Schwab").

## ISSUERS

13.     **Whiting Petroleum Corporation ("Whiting"),** is a Delaware corporation headquartered in Denver, Colorado and engaged in natural gas and petroleum exploration and production.  At relevant times, Whiting's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE (NYSE:  WLL).  During the Relevant Period, Foley served as legal counsel to Whiting.

14.     **Hanger, Inc. ("Hanger"),** is a Delaware corporation headquartered in Austin, Texas and a provider of orthotic and prosthetic patient care.  At relevant times, Hanger's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE (NYSE:  HGR).  During the Relevant Period, Foley served as legal counsel to Hanger.

15.     **Magnetek, Inc. ("MAG")**, is a Wisconsin corporation headquartered in Menomonee Falls, Wisconsin and a manufacturer of digital power control systems.  At relevant times, MAG's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ Global Market (NASDAQ:  MAG).  During the Relevant Period, Foley served as legal counsel to MAG.

16.     **Pentair plc ("Pentair")**, is a multinational, diversified industrial company incorporated in Ireland and headquartered in London, England.  Its main U.S. office is located in Minneapolis, Minnesota.  At relevant times, Pentair's ordinary shares were registered with the

Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE (NYSE: PNR).  During the Relevant Period, Foley served as legal counsel to Pentair.

17.     **Oshkosh Corp. ("Oshkosh")**, is a Wisconsin corporation headquartered in Oshkosh, Wisconsin.  The company designs, manufactures, and markets specialty vehicles and vehicle bodies.  At relevant times, Oshkosh's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE (NYSE:  OSK).  During the Relevant Period, Foley served as legal counsel to Oshkosh.

18.     **Harley Davidson, Inc. ("Harley")**, is a Wisconsin corporation headquartered in Milwaukee, Wisconsin.  The company designs, manufactures, and markets motorcycles.  At relevant times, Harley's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE (NYSE:  HOG).  During the Relevant Period, Foley served as legal counsel to Harley.

19.     **Douglas Dynamics, Inc., ("Douglas")**, is a Delaware corporation headquartered in Milwaukee, Wisconsin and a manufacturer of snow and ice management equipment.  At relevant times, Douglas's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE (NYSE:  PLOW).  During the Relevant Period, Foley served as legal counsel to Douglas.

## OTHER RELEVANT ENTITY

20.     **Foley & Lardner LLP ("Foley")**, is an international law firm headquartered in Milwaukee, Wisconsin.  It employs approximately 900 lawyers in twenty offices worldwide.

## COMMONLY-USED TRADING TERMS

21.     A put option is a contract that gives the owner the right to sell a specified amount of an underlying security at a specified "exercise" or "strike" price within a specified time period.  A put option is a "bearish" position, meaning that it becomes more valuable as the price of the

underlying stock declines relative to the exercise or strike price.  A put option is referred to as "out-of-the-money" when the exercise or strike price of the put option is below the current price of the underlying stock.  This is in contrast to an "in-the-money" put option when the exercise or strike price of the option is above the underlying stock price.  Out-of-the money put options are less expensive than in-the-money options because an out-of-the-money put option cannot be exercised for a profit unless and until the price of the underlying stock drops below the strike price.  If the underlying stock price does not fall below the strike price before the expiration date of the put option, the option expires worthless, and the purchaser will lose the money used to buy the option.

22.     A call option is a contract that gives the owner the right to buy a specified amount of an underlying security at a specified exercise or strike price within a specified time period.  A call option is a "bullish" position in that it becomes more valuable as the price of the underlying stock increases relative to the exercise price.  A call option is referred to as "out-of-the-money" when the exercise or strike price of the call option is above the current price of the underlying stock.  This is in contrast to an "in-the-money" call option when the exercise or strike price of the call option contract is below the underlying stock price.  Out-of-the money call options are less expensive than in-the-money call options because an out-of-the-money call option cannot be exercised for a profit unless and until the price of the underlying stock rises above the strike price.  If the underlying stock price does not rise above the strike price before the expiration date of the call option, the option will expire worthless, and the purchaser will lose the money used to buy the option.

23.     A short call (or selling short a call) means the sale of a call option.  A short call is a bearish position because the seller, in exchange for a fee known as a "premium," grants the buyer the right to purchase a particular stock at a predetermined strike price.  The seller will realize a profit only if the price of the underlying stock remains below the strike price.  If the price of the stock rises

above the strike price and the buyer exercises the call option, the seller will have to deliver the stock

to the buyer and will not benefit from the rise in the stock price.

## STATEMENT OF FACTS

### General Allegations as to the Eleven Corporate Announcements

### and the Defendants' Trading

24.    Since 2013, Little and Berke have resided approximately one-third of a mile from

each other in the same neighborhood community in Apollo Beach, Florida.

25.    Before and throughout the Relevant Period, Little and Berke communicated

extensively, including by phone calls and text messaging.  As described below, these

communications between Little and Berke surged shortly before several of the 11 corporate

announcements that are the subject of this Complaint.

26.    During the Relevant Period, Foley served as legal counsel to each of the seven

issuers listed below and therefore owed each of them duties of loyalty and confidentiality.  As legal

counsel, Foley obtained material, nonpublic information about the 11 corporate announcements and

the events described in the announcements, including information about mergers and acquisitions,

earnings, securities offerings, and a trading suspension/de-listing from the NYSE.

27.    Little accessed and obtained material, nonpublic, confidential information about the

seven issuers and 11 corporate announcements through his access rights on Foley's internal

computer network.  Little's access rights included both "viewing" and "opening" documents.  When

Little viewed a document, he could see the contents, but he did not have the ability to edit or to

create a new version of the document in question.  When Little opened a document, he had the

ability to both edit the document and to create a new version.  As to each of the 11 corporate

announcements described below, the documents Little accessed were related to Foley's

representation of its clients, were confidential and nonpublic, and were not intended for disclosure until the client publicly announced the transaction or event in question.

28.     During the Relevant Period, Little did not bill or perform any services for any of the seven issuers.

29.     Little, based on his relationship of trust and confidence with Foley as well as Foley's corresponding duties of loyalty and confidentiality to its clients, had a duty to maintain the confidentiality of all nonpublic information related to the seven issuers.

30.     Little knew that he was not permitted to trade securities on the basis of the confidential information that he obtained from Foley about the seven issuers.  Little further knew that he could not disclose this information to any recipient not involved in Foley's legal representation, especially when he knew, consciously avoided knowing, or was reckless in not knowing that the recipient would use the information to trade securities.

31.     Nevertheless, Little used material, nonpublic, confidential information to trade securities, as set forth in more detail below.  Furthermore, as to the four issuers and six corporate announcements described in paragraphs 35 through 70, 78 through 118, and 126 through 139 below, Little tipped Berke with material, nonpublic, confidential information, which Berke used to trade securities.

32.     Little tipped Berke with material, nonpublic information (1) for a personal benefit, consisting of a reputational gain by enabling his neighbor with whom he was in near-constant communication to profit from securities trading; and (2) to make a gift of confidential information to Berke, whom he knew, consciously avoided knowing, or was reckless in not knowing would trade upon the information.

33.     Berke knew, consciously avoided knowing, or was reckless in not knowing that Little had breached duties to Foley and the firm's clients in disclosing material, nonpublic information to

him (Berke).  Berke further knew, consciously avoided knowing, or was reckless in not knowing that Little had disclosed the information for a personal benefit or to make a gift of confidential information to Berke.

34.     The public announcements of the 11 corporate transactions and events described below each had a material impact on the stock prices and/or trading volumes of the respective issuers.

### 1.  Whiting

*Fourth Quarter/Full Year 2014 Earnings Announcement (February 25, 2015)*

35.     During the Relevant Period, Foley advised Whiting on the company's earnings release for the fourth quarter and full year 2014.

36.     On February 10, 2015, Little viewed a Whiting-related document on Foley's network titled "12 31 2014 10K – v3_FL Comments."

37.     Between February 11 and 12, 2015, Little viewed and opened email correspondence titled "RE – Whiting Form 10-K" and "Whiting Press Release Draft."

38.     On February 16, 2015, Little and Berke exchanged four text messages.

39.     Between February 17 and 23, 2015, Little bought 58 out-of-the-money Whiting put options for $2,220, and Berke bought 30 out-of-the-money Whiting put options for $1,950.  Little's options had a strike price of $32 and would expire on February 27, 2015—in 10 days or less.  Berke's options had a strike price of $35 and also would expire on February 27, 2015.  Accordingly, Little and Berke were both betting that Whiting's stock price would decline within 10 days, or else they would lose $2,220 and $1,950, respectively.

40.     On February 23, 2015, Little viewed and opened email correspondence titled "WLL Form 10-K."

41.     The next day, February 24, 2015, between 10:02 a.m. and 2:14 p.m., Little and Berke exchanged three text messages and a phone call which lasted over nineteen minutes.  Less than 90 minutes after these communications, at 3:42 p.m., Berke bought 200 out-of-the-money Whiting put options for $2,500.  These options, like Berke's previous purchases, had expiration dates on February 27, 2015.  Therefore, Berke was betting that Whiting's stock price would decline within three days, or else he would lose $2,500.

42.     On February 25, 2015, at 10:51 a.m., Little and Berke exchanged a phone call. Within an hour, at 11:48 p.m., Berke bought 521 out-of-the-money Whiting put options for $5,295. Less than one hour after that, at 12:44 p.m., Little bought 105 out-of-money Whiting put options for $4,605.  Like Berke's and Little's previous options purchases, these options would expire on February 27, 2015.  Including previous trades since February 17, 2015, Little and Berke had each purchased put options totaling $6,825 and $9,745, respectively, all of which they would lose if Whiting's stock price did not decline within two more days.  Furthermore, at 2:23 p.m. on February 25, 2015, Berke added to his bet on a two-day price decline by selling short 50 Whiting call options for $6,686 with an expiration date of February 27, 2015.

43.     After the close of trading on February 25, 2015, at approximately 4:00 p.m., Whiting issued a press release announcing its financial results for the fourth quarter and full year 2014. Whiting reported fourth quarter total revenues of approximately $696 million, as compared to $720 million for the same period of the prior year.  Whiting subsequently furnished the earnings release to the SEC as an attachment to its Form 8-K.

44.     On February 26, 2015, the first trading day after Whiting's press release, Whiting's stock price closed at $34.00, a decline of $2.77 (7.5%) from the prior day's closing price of $36.77, with an increased trading volume of more than 45 percent.

45.     On February 26, 2015, Berke covered short positions on the 50 Whiting call options for $4,522, realizing total profits of approximately $2,164.  On February 26 and 27, 2015, Little sold 85 out-of-the-money Whiting put options, realizing total profits of approximately $3,350.

*Whiting Securities Offering Announcement (March 23, 2015)*

46.     In March 2015, Foley advised Whiting with respect to a private offering of senior notes and a registered offering of common stock.

47.     Between March 4 and 9, 2015, Little opened documents on Foley's network titled "Whiting Petroleum – 2015 Mandatorily Convertible Preferred Stock Offering Prospectus," "Whiting 2015 - Prospectus Supplement –Common Stock_Revised" and "Whiting Petroleum Senior Note Offering Prospectus Supplement."  Little also viewed a document titled "Whiting -- 2015 Offerings -- Launch Press Release."

48.     On March 13, 2015, Little viewed several documents related to Whiting, including those titled "Whiting_2015 Spring Offerings Checklist," "Whiting 2015 – Prospectus Supplement – Convert," "Whiting -- Convertible Note (Precedent Comments March 2015)" and "Whiting -- 2015 Offerings -- Launch Press Release."  Little also opened a document titled "Whiting 2015 - Prospectus Supplement - Common Stock_Revised."

49.     Between March 14 and 16, 2015, Little and Berke exchanged 16 text messages and three phone calls.

50.     Between March 17 and 18, 2015, Little viewed several documents related to Whiting, including those titled "WLL 2015 Shelf S-3 ASR (Post-effective Amendment)," "Whiting -- 2015 Offerings -- Launch Press Release," "WLL-WOGC Board Consent (2015 Senior Notes Offering)," and "Whiting Petroleum Senior Note Offering Prospectus Supplement."

51.     On March 19, 2015, at 12:27 p.m., Little viewed a document titled "WLL -- Form 8-K (Pro Forma)."  Within 10 minutes, Little bought 10 out-of-the-money Whiting put options for $650.

52.     On March 19, 2015, between 2:09 p.m. and 2:12 p.m., Little viewed documents related to Whiting titled "WLL – Whiting 2015 – Underwriting Agreement – Common Stock" and "Whiting -- 2015 Offering -- Launch Press Release."  During the same time period, at 2:11 pm, Little opened a document related to Whiting titled "Whiting 2015 - Prospectus Supplement - Common Stock_Revised."  Less than a half hour later, at 2:40 p.m., Little bought 305 out-of–the-money Whiting put options for $23,425.  The options had strike prices ranging from $35 to $37 and would expire on March 27, 2015—in just eight days.  Accordingly, Little was betting that Whiting's stock price would decline within eight days, or else he would lose all of his $23,425.

53.     On March 20, 2015, between 8:31 a.m. and 12:33 p.m., Little viewed documents related to Whiting titled "Whiting 2015 – Prospectus Supplement – Common Stock_Revised" and "WLL – Form 8-K – (Pro Forma)."

54.     On March 20, 2015, at 1:03 p.m., Little and Berke exchanged a phone call which lasted over twelve minutes.

55.     On March 20, 2015, between 1:24 p.m. and 3:07 p.m., Berke bought 527 out-of-the-money Whiting put options for $55,370.  The options had strike prices ranging from $27.50 to $38.50 and would expire in one week on March 27, 2015.  Accordingly, Berke was betting that the stock price would decline within one week, or else he would lose all of his $55,370.

56.     Thereafter, between March 20 and 22, 2015, Little viewed additional documents related to Whiting, including those titled "Whiting – 2015 Offerings – Common Stock Pricing Press Release," "Whiting – 2015 Offerings – Convertible Notes Pricing Press Release," "Whiting – 2015 Offerings – Senior Notes Pricing Press Release," "WLL -- NYSE Listing Application

Common Stock Letter (2015 Equity Offering)," and "WLL – Action of the Special Offering Committee (2015 Equity Offering)."  Little also opened a document related to Whiting titled "WLL – WOGC Universal Shelf Consent Action (2015 Shelf S-3)."

57.     Between March 21 and 23, 2015, Little and Berke exchanged seventeen text messages and three phone calls.

58.     On March 23, 2015, Berke bought 305 out-of-the-money Whiting put options for $34,387.  The options had strike prices ranging from $31 to $39 and would expire in four days on March 27, 2015.  Accordingly, Berke was betting that Whiting's stock price would decline within four days, or else he would lose all of his $34,387.  Together with his options purchases on March 20, 2017, he would lose a total of $89,757 if the price did not decline.

59.     After the close of trading on March 23, 2015, at approximately 5:16 p.m., Whiting issued a press release announcing that it had commenced two private offerings of company notes, consisting of $1 billion in convertible senior notes due 2020 and $750 million in senior notes due 2023.  Whiting also announced that it had commenced a registered public offering of 35,000,000 shares of its common stock.

60.     On March 24, 2015, before the opening of trading, Whiting described these offerings in a Form 8-K filed with the SEC.  Later that day, which was the first trading day after these announcements, Whiting's stock price closed at $30.91, a decline of $7.48 (19.48%) from the prior day's closing price of $38.39, with an increased trading volume of more than 1,038 percent.

61.     Between March 24 and 25, 2015, Little sold 315 Whiting put options, realizing total profits of approximately $121,125.  During the same time, Berke sold 722 Whiting put options, realizing total profits of approximately $303,255.

<u>*Whiting Second Quarter 2015 Earnings Announcement (July 29, 2015)*</u>

62.     During the Relevant Period, Foley advised Whiting on its Form 10-Q and earnings release for the second quarter of 2015.

63.     Between July 16 and 22, 2015, Little viewed documents on Foley's network titled "WLL_8-K 2nd Quarter Pre-Release" and "Form 10-Q 6 30 15_FL Comments."

64.     Between July 23 and 27, 2015, Little and Berke exchanged twenty text messages.

65.     Between July 28 and 29, 2015, Berke bought 1,000 Whiting put options (of which 700 were out-of-the-money) for $84,300.  The options had strike prices ranging from $20 to $24.50 and would expire on July 31, 2015, *i.e.*, in three days or less.  Accordingly, if Whiting's stock price did not decline or remain below the strike prices of Berke's options within three days or less, he would lose approximately $84,300.

66.     On July 29, 2015, between 10:36 a.m. and 3:50 p.m., Little bought 315 Whiting put options (of which 275 were out-of-the-money) for $22,925.  The options had strike prices ranging from $22 to $24 and would expire on July 31, 2015, *i.e.*, in only two days.  Therefore, if Whiting's stock price did not decline or remain below the strike prices of Little's options within two days, he would lose approximately $22,925.

67.     After the close of trading on July 29, 2015, at approximately 4:04 p.m., Whiting issued a press release announcing its second quarter 2015 financial results.  For the quarter, Whiting reported adjusted diluted earnings per share of $0.04 on revenues of $590 million.  For the same period a year earlier, the company had reported amounts of $1.40 and $835.62 million, respectively.  Soon afterward, Whiting furnished its earnings release to the SEC as an attachment to its Form 8-K.

68.     On July 30, 2015, the first trading day after the earnings release, Whiting's stock price closed at $22.38, which was a $.80 decline (3.57%) from the prior day's closing price of $23.18, with

an increased trading volume of more than 33 percent.  After the close of trading, Whiting filed its Form 10-Q with the SEC.

69.     On July 30, 2015, Berke sold 550 Whiting put options, realizing total profits of approximately $28,840.

70.      Between July 30, 2015 and August 6, 2015, Little sold 315 Whiting put options, realizing total profits of approximately $35,150.

<u>*Whiting Third Quarter 2015 Earnings Announcement (October 28, 2015)*</u>

71.     Foley advised Whiting on its earnings release and Form 10-Q for the third quarter of 2015.

72.     On October 22, 2015, Little viewed email correspondence on Foley's network related to Whiting titled "WLL Form 10-Q."   He also viewed documents related to Whiting titled "WLL 2015 Q3 Script v1_FL Comments" and "Q3 15Earnings_Release_Draft_FL Comments."

73.     On October 28, 2015, between 8:18 a.m. and 8:24 a.m., Little viewed documents titled "Form 10-Q 9 30 2015 – v2 accept_FL Comments," "WLL 2015 Q3 Script v1_FL Comments," and "Q3 15Earnings_Release_Draft_FL Comments."  During this time, Little also viewed email correspondence related to Whiting titled "RE-Whiting Earnings Packet."

74.      On October 28, 2015, between 1:59 p.m. and 3:59 p.m., Little bought 60 Whiting put options (of which 40 were out-of-the-money) for $5,640.

75.     After the close of trading on October 28, 2015, at approximately 4:01 p.m., Whiting issued a press release announcing its financial results for the third quarter, including its adjusted net income or loss per diluted share.  For the third quarter of 2015, Whiting reported a net loss of ($0.17) per share compared to net income per share of $1.24 for third quarter of the prior year.

76.     On October 29, 2015, the first trading day after the earnings release, Whiting's stock price closed at $16.46, a decline of $.60 (3.5%) from the prior day's close of $17.06, with an

increased trading volume of over 36%.  Following trading that day, Whiting filed its Form 10-Q with the SEC.

77.     On October 29, 2015, Little sold 60 Whiting put options, realizing total profits of approximately $1,760.

### 2.  Hanger Inc.

#### *NYSE Delisting/OTC Trading Announcement (February 26, 2016)*

78.     Foley served as legal counsel to Hanger on its press release and Form 8-K announcing Hanger's delisting from the NYSE and its commencement of trading over-the-counter (OTC).  Hanger was preparing the Form 8-K to disclose updated information about the company's accounting investigation into certain financial misstatements.

79.     On February 17, 2016, Little viewed a Hanger-related document on Foley's network titled "Hanger – Form 8-K 2016 Delisting."  Little also viewed various email correspondences related to Hanger titled "FW – Hanger - Debt Implications of Accounting Investigative Findings," "FW-[Hanger] Foley Investigation revised presentation," "FW-Foley comments on draft Hanger Form 8-K – Privileged & Confidential" and "FW – [Hanger] Foley investigation revised presentation."

80.     On February 18, 2016, at 9:29 a.m., Little and Berke exchanged a phone call.  Within about fifteen minutes, Berke bought 40 Hanger put options for $7,560.  Later that day, Little viewed email correspondence related to Hanger titled "RE-[Hanger] Board Presentation."

81.     On February 19, 2016, Little bought 30 Hanger put options for $2,550.

82.     On February 20, 2016, Little viewed correspondence related to Hanger titled "RAC Audit Investigation; Document Review Guidance" and "Hanger Word Tables for 8-K."

83.    On February 22, 2016, Little bought 26 Hanger put options for $1,790.  Later that day, Little viewed email correspondence related to Hanger titled "RE-Got your voicemail" and a document titled "Draft Investor FAQ."

84.    On February 23, 2016, Little bought 15 out-of-the-money Hanger put options for $2,100.

85.    On February 24, 2016, at 11:09 a.m., Little viewed a document titled "Hanger-Suspension of NYSE trading and commencemnt [sic] of OTC trading Press Release."  Within a half hour, Little bought 10 Hanger put options for $800.

86.    On February 25, 2016, Little viewed a memorandum related to Hanger titled "2106.02.25 SEC Enforcement Meeting Memorandum."

87.    On February 26, 2016, at 10:24 a.m., Little and Berke exchanged a phone call.  Later that day, at 1:36 p.m., Berke bought 105 out-of-the-money Hanger put options for $5,925.

88.    On February 26, 2016, at approximately 4:02 p.m., Hanger filed a Form 8-K with the SEC announcing (1) that it had been suspended from trading and was being delisted from the NYSE for failing to meet a filing deadline to file its Form 10-K for 2014; and (2) that it would begin trading OTC on February 29, 2016.  Hanger also provided an update regarding an accounting investigation into financial misstatements.  Later that evening, Hanger issued a press release regarding the Form 8-K.

89.    On March 1, 2016, Berke sold 145 Hanger put options, realizing total profits of approximately $115,815.

90.    Between March 1 and 3, 2016, Little sold 81 Hanger put options, realizing total profits of approximately $58,810.

### 3.  Magnetek, Inc. ("MAG")

*Merger Announcement (July 27, 2015)*

91.     During the Relevant Period, Foley served as legal counsel to MAG regarding a possible merger between MAG and Columbus McKinnon Corporation ("Columbus").

92.     Between February 8 and 19, 2015, Little opened email correspondence on Foley's network related to MAG titled "RE-Project Megatron – Engagement Letter Comments," "FW - Project Megatron – Engagement Letter Comments" and "FW-Megatron Follow Ups."  During this time, Little also opened a letter related to MAG titled "Project Megatron – Goldman Sachs Engagement Letter."

93.     Between May 8 and 21, 2015, Little again viewed documents related to MAG, including those titled "MAG – Merger Agreement Tasks," "MAG – Megatron Q &A," "Project Megatron – Draft Merger Agreement," and "Megatron Summary of Merger Agreement."

94.     On May 24, 2015, Little opened email correspondence titled "RE – Project Megatron – Engagement Letter and Confidentiality Agreement."

95.     Between May 26 and 28, 2015, Little bought 3,172 shares of MAG stock for $112,145.

96.     On May 28, 2015, between 3:36 p.m. and 3:41 p.m., Little and Berke exchanged three text messages.   Within a half hour, Berke bought 900 shares of MAG stock for $30,732.  Later that day, Little and Berke exchanged two text messages and a phone call for over eight minutes.

97.     On May 29, 2015, Berke bought 2,635 shares of MAG stock for approximately $87,866.

98.     Between May 30 and June 1, 2015, Little viewed additional documents on the Foley network related to MAG, including those titled "MAG – Merger Agreement Tasks" and "Megatron Summary of Merger Agreement."  During this time, Little also viewed email correspondence titled

"FW-Megatron Bid Call" and viewed and opened email correspondence titled "Project Megatron Bid Review."

99.     On June 2, 2015, Little bought 1,500 shares of MAG for $49,045.

100.     Between June 4 and June 11, 2015, Little viewed email correspondence titled "RE-Magnetek Coordination" and also viewed and opened email correspondence titled "Megatron Merger Agreement."

101.     On June 12, 2015, Little bought 200 MAG shares for $6,875.

102.     Between June 14 and 17, 2015, Little viewed email correspondence titled "MAG – Megatron re Exclusivity," "RE – Project Megatron – GS, CM and Exclusivity," and "Project Megatron – Update."

103.     On June 19, 2015, at 1:41 p.m., Berke bought 500 shares of MAG for $16,975.

104.     On June 19, 2015, at 2:24 p.m., Little viewed and opened email correspondence titled "Megatron Bid Summary."

105.     On June 19, 2015, at 3:00 p.m., Little and Berke exchanged a phone call for over eight minutes.

106.     On June 19, 2015, at 3:52 p.m., Little bought 500 shares of MAG for $17,025.

107.     On June 22, 2015, Little and Berke exchanged five text messages.

108.     Between June 22 and 23, 2015, Berke bought 7,099 shares of MAG for $241,612. Little bought 325 shares of MAG for $10,550.

109.     Thereafter, between June 24 and June 30, 2015, Little viewed and opened email correspondence titled "RE- Megatron Board Call" and "Megatron – Merger Agreement and Summary."  During this time, Little also viewed emails related to MAG, including those titled "FW-Project Megatron – In-Person Board of Director Meeting(s)," "MAG Offer Condition," and "RE-

Megatron – Merger Agreement and Board Summary." Little also viewed a document related to MAG titled "MAG Board Minutes – June 24, 2015."

110.     Between July 2 and July 20, 2015, Little viewed additional emails related to MAG, including those titled "FW – Megatron – Merger Agreement and Board Summary," "RE – Project Megatron – Company Disclosures Schedules," "Megatron Board Update Materials," "RE – Megatron Process Letter," "RE – Project Megatron Advice Request," "Project Megatron – Board Update," and "RE- Megatron – Revised Merger Agreement."

111.     Between July 21, 2015 and July 22, 2015, Little viewed and opened email correspondence titled "RE – Megatron Process Letter" and "Project Megatron – Board Update."

112.     On July 23, 2015, at 9:25 p.m., Little viewed email correspondence titled "RE-Project Megatron – Revised Merger Agreement."

113.     On July 24, 2015, between 8:31 a.m. and 8:34 a.m., Little and Berke exchanged six text messages.

114.     On July 24, 2015, at 9:41 a.m., Berke bought 860 shares of MAG stock for $27,984.

115.      On July 27, 2015, Columbus issued a press release prior to the opening of trading announcing it had entered into an agreement to acquire all of the outstanding shares of MAG for $50 per share for a total value of $188.9 million.  On the same day, at approximately 8:35 a.m., MAG filed a Form 8-K with the SEC regarding the merger.  The Form 8-K stated that, among other things, MAG had signed a merger agreement with Columbus and Columbus's wholly-owned subsidiary Megatron Acquisition Corp.

116.     On July 27, 2015, MAG's stock price stock price closed at $49.25, an increase of $17 (30%) from the prior day's closing price of $32.25, with an increased trading volume of over 1,244 percent.

117.     On July 27, 2015, Little sold 4,922 shares of MAG, realizing total profits of approximately $75,777.

118.     Also on July 27, 2015, Berke sold 10,534 shares of MAG, realizing total profits of approximately $165,039.

### 4.  Pentair plc

*Second Quarter 2015 Earnings Announcement (July 21, 2015)*

119.     During the Relevant Period, Foley advised Pentair on its Form 10-Q for the second quarter of 2015.

120.     On July 15, 2015, Little opened email correspondence on Foley's network related to Pentair titled "Q2 2015 10-Q Draft #1."

121.     Between July 17 and 20, 2015, Little bought 40 out-of-the-money Pentair put options for $2,767.

122.     On July 20, 2015, at 9:00 p.m., Little viewed and opened email correspondence related to Pentair titled "FW – Q2 2015 Conference Call Script JLS.docx."

123.     On July 21, 2015, Pentair issued a press release and filed a Form 8-K with the SEC announcing second quarter earnings for 2015 that were lower than second quarter of the previous year.

124.     On July 21, 2015, Pentair's stock price closed at $61.60, a decline of $2.48 (3.8%) from the prior day's closing price of $64.08, with an increased trading volume of more than 58 percent.  After regular trading that day, Pentair filed its Form 10-Q with the SEC.

125.     Between July 24 and 27, 2015, Little sold 40 out-of-the-money put options, realizing total profits of approximately $1,023.

*Pentair Merger Announcement (August 17, 2015)*

126.    During the Relevant Period, Foley also served as legal counsel to Pentair on a possible merger between Pentair and ERICO Global Company ("ERICO").

127.    On July 6, 2015, Little viewed a memorandum on Foley's network related to Pentair titled "Pentair – Project Lionel – Initial Analysis – Preliminary Information Request (July 6 2015)."

128.    On July 12, 2015, Little viewed a document related to Pentair titled "Project Lionel – Initial Due Diligence Memo."

129.    On July 14, 2015, Little viewed a document titled "Pentair plc – Board Resolutions – Project Lionel Acquisition Approval."

130.    On August 4, 2015, Little viewed documents titled "Pentair – Commitment Letter (Lionel) (8-4-15 F&L comments)," and "Lionel Goldman Sachs Engagement Letter."  Little also opened the document related to Pentair titled "Pentair – Commitment Letter (Lionel) (8-4-15 F&L comments)."

131.    On August 5, 2015, Little and Berke exchanged three text messages and five phone calls.  One of the phone calls lasted over 11 minutes.

132.    On August 6, 2015, Berke bought 268 Pentair call options for $50,080.  The options had a strike price of $60 and would expire in 15 days on August 21, 2015.  Accordingly, if Pentair's stock price did not remain above $60 for 15 days, he would lose all of his $50,080.

133.    On August 9, 2015, Little and Berke exchanged three text messages.

134.    On August 10, 2015, Berke bought 100 out-of-the-money Pentair call options for $2,500.  The options had a strike price of $65 and would expire on August 21, 2015.  Therefore, Berke was betting that Pentair's stock price would rise above $65 within 11 days, or else he would lose $2,500.

135.     On August 11, 2015, at 7:22 a.m., Little viewed a document titled "Project Lionel –
Form 8-K (Execution of Merger Agreement)."  That same morning, at 8:12 a.m., Little and Berke
exchanged a phone call.

136.     Thereafter, between August 11 and 14, 2015, Berke bought 532 Pentair call options
(of which 300 were out-of-the-money), for $69,200.  Little bought 133 Pentair call options (of which
40 were out-of-the-money), for $18,595.  The options purchased by Berke and Little had strike
prices of $60 or $65 and would expire on August 21, 2015 or September 18, 2015.  Accordingly,
Berke and Little were betting that Pentair's stock price would rise above the strike prices by the
expiration dates, or else they would lose up to $69,200 (Berke) and $18,595 (Little).

137.     On August 17, 2015, Pentair issued a press release announcing that it had entered
into an agreement with ERICO Global Company ("ERICO") whereby Pentair would acquire
ERICO for $1.8 billion in cash, including the repayment of ERICO debt.  The next day, Pentair
filed a Form 8-K with the SEC describing the merger and the merger agreement.

138.      On August 17, 2015, Pentair's stock price closed at $62.60, an increase of $.93
(1.5%) from the prior day's closing price of $61.67, with an increased trading volume of more than
411 percent.

139.     On August 17, 2015, Little sold 93 Pentair call options, realizing total profits of
approximately $9,255.  On the same day, Berke sold 448 Pentair call options, realizing total profits
of approximately $25,538.

### 5.  Oshkosh Corp.

*Third Quarter 2015 Earnings Announcement (July 29, 2015)*

140.     During the Relevant Period, Foley advised Oshkosh on its earnings release and
Form 10-Q for the third quarter of 2015.

141.     On July 13, 2015, Little viewed an Oshkosh-related document on Foley's network titled "draft 8-K."

142.     On July 19, 2015, Little viewed and opened email correspondence titled "Fiscal 2015 Q3 conference call slides, script and press release."

143.     Between July 28 and 29, 2015, Little bought 75 Oshkosh put options for $19,425.

144.     On July 30, 2015, Oshkosh issued its earnings release prior to the opening of trading that day.  The company announced a 16.6 percent decrease in consolidated net sales compared to the third quarter of the prior year.  Later that day, Oshkosh furnished the earnings release to the SEC on Form 8-K and filed its Form 10-Q for the quarter.

145.     On July 30, 2015, Oshkosh's stock price closed at $36.05, a decline of $3 (7.6%) from the prior day's closing price of $39.05, with an increased trading volume of more than 388 percent.

146.     On July 30 and 31, 2015, Little sold 75 Oshkosh put options, realizing total profits of approximately $29,175.

### 6.  Harley Davidson, Inc.

*First Quarter 2015 Earnings Announcement (April 21, 2015)*

147.     During the Relevant Period, Foley served as legal counsel to Harley Davidson on Harley Davidson's earnings release for the first quarter of 2015.

148.     On April 16, 2015, just after midnight at 12:26 a.m., Little viewed a Harley Davidson-related document on Foley's network titled "HD Q1-15 Release DRAFT 4-12."

149.      On April 16 and 17, 2015, Little bought 150 Harley Davidson put options (of which 130 were out-of-the-money) for $15,255.  The options had strike prices ranging from $52.50 to $65 and would expire on May 15, 2015.  Accordingly, Little was betting that Harley Davidson's stock price would remain below the strike prices of his options, or else he would lose up to $15,255.

150.     On April 21, 2015, Harley Davidson issued a press release prior to the opening of trading announcing its financial results for the quarter.  The announcement reported consolidated revenue of $1.67 billion for 2015 compared to $1.73 billion in the first quarter of the prior year.

151.     On April 21, 2015, Harley Davidson's stock price closed at $55.72, a decline of $6.05 (9.7%) from the prior day's closing price of $61.77, with an increased trading volume of more than 352 percent.

152.     On April 21, 2015, Little sold 150 Harley Davidson put options, realizing total profits of approximately $22,205.

### 7.  Douglas Dynamics, Inc.

*Second Quarter 2015 Earnings Announcement (August 3, 2015)*

153.     During the Relevant Period, Foley advised Douglas Dynamics on its earnings release for the second quarter of 2015.

154.     On July 20, 2015, Little viewed a document on Foley's network related to Douglas Dynamics titled "PLOW_2Q15_Earnings Release Draft_7.17.15_Updated."

155.     Between July 28 and 30, 2015, Little bought 2,530 shares of Douglas Dynamics stock for $51,188.

156.     On August 3, 2015, after the close of trading, Douglas Dynamics issued its earnings release for the second quarter, which reported an increase in net sales of 21% compared to the second quarter of the prior year.

157.     On August 4, 2015, Douglas Dynamics's stock price closed at $23.36, an increase of $2.60 (12.52%) from the prior day's closing price of $20.76, with an increased trading volume of more than 168 percent.  After the close of trading, Douglas filed with the SEC its Form 10-Q for the quarter.

158.    On August 6, 2015, Little sold 2,530 shares of Douglas Dynamics, realizing total profits of approximately $6,167.

## FIRST CLAIM FOR RELIEF

### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

159.    As to Defendant Little, the Commission realleges and reincorporates paragraphs 1 through 158 as if fully set forth herein.  As to Defendant Berke, the Commission realleges and incorporates paragraphs 1 through 70, 78 through 118, and 126 through 139 as if fully set forth herein.

160.    Defendants, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails or of any facility of any national securities exchange, in connection with the purchase or sale of securities, directly or indirectly:

    (a)  employed devices, schemes, or artifices to defraud;

    (b)  made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    (c)  engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit.

161.     By reason of the actions alleged herein, Defendants violated Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*] and unless restrained and enjoined will continue to do so.

## SECOND CLAIM FOR RELIEF

### Violations of Securities Act Section 17(a)

162.     As to Defendant Little, the Commission realleges and reincorporates paragraphs 1 through 158 as if fully set forth herein.  As to Defendant Berke, the Commission realleges and incorporates paragraphs 1 through 70, 78 through 118, and 126 through 139 as if fully set forth herein.

163.     Defendants, with scienter, by use of the means or instruments of transportation or communication in interstate commerce or by use the mails, in the offer or sale of securities, directly or indirectly:

(a)   employed devices, schemes, or artifices to defraud;

(b)   obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)   engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchaser.

164.     By reason of their actions alleged herein, Defendants violated Section 17(a) of the Securities Act [*15 U.S.C. § 77q(a)*] and unless restrained and enjoined will continue to do so.

## THIRD CLAIM FOR RELIEF

### Violations of Exchange Act Section 14(e) and Rule 14e-3 Thereunder

165.     The Commission realleges and reincorporates paragraphs 2, 6 through 12, 15, 20, 24 through 29, 34, and 91 through 118 as if fully set forth herein.

166.     By May 26, 2015, the date of the first illegal trade in MAG securities alleged herein, substantial steps to complete the tender offer of MAG had already been taken, including MAG's retention of legal and financial advisors and the drafting of a merger agreement and other merger-related documents.

167.     Little knew or had reason to know that the information regarding the MAG tender offer was nonpublic information that had been acquired by Little's employer, Foley, who served as legal counsel to MAG for the deal.  Little was required to refrain from communicating this information to third parties, including his neighbor, Berke, under circumstances in which it was reasonably foreseeable that such communications were likely to result in unlawful trading.

168.     Berke knew or had reason to know that the information Little revealed about the MAG tender offer was nonpublic information that been acquired from someone working on behalf of the offeror or issuer.

169.     Prior to the public announcement of the MAG tender offer and after a substantial step or steps to commence the tender offer had been taken, Little, while in possession of material information related to the tender offer, which information he knew or had reason to know was nonpublic and had been acquired directly or indirectly from the offering company, the issuer, or any officer, director, partner, or employee, or other person acting on behalf of the offering company or issuer, communicated material, nonpublic information related to the tender offer to Berke under circumstances in which it was reasonably foreseeable that the communication was likely to result in the purchase or sale of the securities referenced above.

170.     Prior to the public announcement of the tender offer and after a substantial step or steps to commence the tender offer had been taken, Little and Berke, while in possession of material information relating to the tender offer, purchased securities in MAG.

171.     By reason of their actions alleged herein, Defendants violated Section 14(e) of the Exchange Act [*15 U.S.C. § 78n(e)*] and Rule 14e-3 [*17 C.F.R. § 240.14e-3*] thereunder and unless restrained and enjoined will continue to do so.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectively requests that the Court enter a judgement:

(i)      finding that the Defendants violated each of the provisions of the federal securities laws alleged herein;

(ii)     permanently enjoining Defendants from violating Section 17(a) of the Securities Act [*15 U.S.C. § 77q(a)*], Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.14b-5*], and Section 14(e) of the Exchange Act [*15 U.S.C. § 78n(e)*] and Rule 14e-3 [*17 C.F.R. § 240.14e-3*] thereunder;

(iii)    ordering Little and Berke each to disgorge, with prejudgment interest, all of their illicit trading profits or other ill-gotten gains;

(iv)     ordering Little to jointly and severally disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains received any person or entity, including Berke and any other direct and indirect tippees, as a result of the actions alleged herein;

(v)      ordering Defendants to pay civil penalties under Sections 21(d)(3) and 21A of the Exchange Act [*15 U.S.C. §§ 78u(d)(3) and 78u-1*]; and

(vi)    granting such other relief as this Court may deem just and proper.

Respectfully submitted,

Dated:  May 11, 2017

s/ Kevin C. Lombardi
Kevin C. Lombardi (*pending pro hac vice*)
Tel:  (202) 551-8753
Charles D. Stodghill (*pending pro hac vice*)
Tel:  (202) 551-4413
SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC  20549
Facsimile:  (202) 772-9291

Of counsel:
Richard Kutchey
SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC  20549